COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, SS.                         SUPERIOR COURT DEPARTMENT
                                     OF THE TRIAL COURT
                                     CIVIL ACTION NO. 1883CV00461


ABIGAIL LIVRAMENTO
    PLAINTIFF

V.


CITY OF BROCKTON
    DEFENDANT

### FIRST AMENDED COMPLAINT
### JURY TRIAL DEMANDED

1.    The plaintiff Abigail Livramento resides in Brockton, Massachusetts, County of
      Plymouth.

2.    The defendant City of Brockton is a duly organized municipal corporation and has
      a business address of 45 School Street, Brockton, Massachusetts County of
      Plymouth. The defendant City of Brockton is a public employer within the meaning
      of G.L. c. 258.

### BRIEF STATEMENT OF FACTS COMMON TO ALL COUNTS

      The plaintiff Abigail Livramento provides this brief statement of facts in summary
form which is not intended to be all inclusive.

1.    In the morning of April 27, 2015, Officer Lindsey Ferebee of the Brockton Police
      Department, in the course of his employment, attempted to make a traffic stop.

2.    Officer Ferebee decided to make this stop due to the driver, Marcelino Correia,
      committing minor traffic infractions, including driving through a stop sign, failing
      to activate his turn signal, and driving fifteen miles per hour over the posted speed
      limit.

3.    Mr. Correia, at this time, had four passengers in his car, Matthew Andrade,
      Stephanie Barros, Denise Moreira, and plaintiff Abigail Livramento.

4.    Mr. Correia refused to pull his vehicle to the side of the road, and instead fled
      Officer Ferebee, despite his passengers pleading for him to pull over.

5.    Officer Ferebee began a high speed pursuit of Mr. Correia, with speeds reaching eighty five miles per hour, almost triple the posted city limits.

6.    Officer Ferebee traveled closely behind Mr. Correia during this high speed chase.

7.    Officer Ferebee understood there was at least one passenger in Mr. Correia's vehicle.

8.    There were other people on and around the road upon which this high speed pursuit took place.

9.    Officer Ferebee continued the high speed pursuit, even though Mr. Correia was traveling at high rates of speed through red lights.

10.   Shortly after crossing into Avon, Massachusetts, Mr. Correia lost control of his vehicle, crashing into a light pole head on.

11.   Every occupant of Mr. Correia's vehicle was ejected, with one landing 200 feet from the scene of the crash.

12.   Matthew Andrade and Denise Moreira were both killed.

13.   Plaintiff Abigail Livramento suffered extensive injuries including a fractured spine, an acute subdural hematoma which had to be drained twice by emergency craniotomy, a severe concussion, acute memory loss, fractures to the third, fourth, and fifth metacarpals on her right hand, a torn meniscus in her left knee, a torn ACL in her left knee, collapsed lungs, lacerations all over her body, pain throughout her back, and the development of seizures.

14.   The City of Brockton's High Speed Pursuit policy fails to include or address any requirement for the initiating officer to evaluate the circumstances before initiating a pursuit and to continually reevaluate those factors during the pursuit along with the reasonableness of continuing the pursuit.

15.   The City of Brockton's High Speed Pursuit policy fails to include or designate the secondary unit's responsibilities.

16.   The City of Brockton's High Speed Pursuit policy fails to include dispatcher's responsibilities.

17.   The City of Brockton's High Speed Pursuit policy fails to address the issue of engaging in interjurisdictional pursuits involving personnel from the agency and/or other jurisdictions.

18.   The City of Brockton's High Speed Pursuit policy fails to require an administrative review of each such pursuit.

19.   The City of Brockton's High Speed Pursuit policy fails to require an annual documented analysis of pursuit reports.

20.   The City of Brockton's High Speed Pursuit policy allows officers to initiate a pursuit for any motor vehicle infraction.

21.   The City of Brockton's High Speed Pursuit policy does not require officers to terminate the pursuit under certain circumstances.

22.   The City of Brockton's High Speed Pursuit policy contains no directives prohibiting pursuit due to motor vehicle infractions.

23.   There is no annual audit of pursuit reports.

24.   The City of Brockton's High Speed Pursuit policy does not contain any prohibitions on when to pursue.

25.   The City of Brockton's High Speed Pursuit policy does not contain guidance on when and under what circumstances an officer can pursue.

26.   The Brockton Police Department has no review of pursuits beyond a supervisor's review of the report.

27.   Officer Ferebee received no training from the Brockton Police Department, or otherwise, on when to engage in a pursuit or when to terminate a pursuit.

28.   Officer Ferebee received no training from the Brockton Police Department, or otherwise, regarding the weighing of the need to apprehend versus risks of high speed pursuits.

29.   Officer Ferebee received no training from the Brockton Police Department, or otherwise, in considering whether the danger of the pursuit exceeds the danger of the pursuing vehicle if it escaped.

30.   Brockton Police Department did not train its supervisors on how to weigh the risks to life and property versus the need for immediate apprehension or continued pursuit.

31.   Brockton Police Department's in-service training does not cover high-speed pursuits or best practices in high-speed pursuits.

32.   The City of Brockton's High Speed Pursuit policy allowed officers who had never been trained in the subject of high speed pursuits, to make subjective determinations which they were untrained and unqualified to do, resulting in foreseeable extreme and recurrent danger to the public, including the plaintiff herein.

33. Officer Ferebee was never disciplined for his role in this crash and Police Chief Emanual Gomes believes Officer Ferebee's actions were appropriate.

### COUNT I: CLAIM OF ABIGAIL LIVRAMENTO FOR PERSONAL INJURY AGAINST THE CITY OF BROCKTON

1. The plaintiff hereby restates and incorporates by reference herein, the allegations set forth in the Brief Statement of Facts Common to All Counts and asserts that the defendant named herein was negligent for the following reasons.

2. On or about April 27, 2015, the defendant City of Brockton or those entities or persons for whom the defendant City of Brockton is legally responsible, so negligently, carelessly and unskillfully managed, controlled or owned a vehicle, so as to cause Mr. Correia's vehicle, in which plaintiff was a passenger, to go off the road and crash, resulting in personal injuries to the plaintiff herein.

3. As a result of the aforesaid negligence on the part of the defendant City of Brockton, its agents, servants and employees, the plaintiff has undergone pain and mental anguish.

4. As a further result of the aforesaid negligence on the part of the defendant City of Brockton, its agents, servants and employees, the plaintiff has been obliged to expend sums of money for medical, x-ray, hospital, ambulance and nursing services.

5. As a further result of the aforesaid negligence on the part of the defendant City of Brockton, its agents, servants and employees, the plaintiff has suffered depreciation in earning capacity and will continue to do so in the future.

6. The plaintiff has a cause of action under M.G.L. Ch. 231 sec. 6D.

7. The defendant City of Brockton is a public employer within the meaning of G.L. c. 258 of the individuals referred to in paragraph 1 of Count I.

8. Prior to the institution of this action the plaintiff first submitted the claim in writing to the defendant, which claim has been denied within the meaning of Mass. Gen. Laws Chapter 258 by the failure of the City of Brockton to take any action on said claim.

9. All procedural prerequisites to the filing and maintenance of this action have been complied with.

**COUNT II:   CLAIM OF ABIGAIL LIVRAMENTO AGAINST CITY OF BROCKTON FOR VIOLATIONS OF CIVIL RIGHTS PURSUANT TO 42 U.S.C. §1983**

1.  The plaintiff hereby restates and incorporates by reference herein, the allegations set forth in the Brief Statement of Facts Common to All Counts and asserts her civil rights were violated pursuant to 42 U.S.C. §1983 for the following reasons.

2.  On or about April 27, 2015 the defendant herein interfered, through its absolute disregard in relation to its policies, procedures, and training of officers concerning the initiation and continuation with high speed pursuits, with the exercise or enjoyment by the plaintiff of rights secured by the constitution of the United States under 42 U.S.C. §1983.

3.  As a result of the aforesaid conduct on the part of the defendant herein the plaintiff was caused to suffer physical injuries, pain and mental anguish and will continue to do so for an indefinite time in the future.

4.  As a result of the aforesaid conduct on the part of the defendant, the plaintiff has been obliged to expend sums of money for medical care and attention.

5.  As a result of the aforesaid conduct on the part of the defendant, the plaintiff has been obliged to expend sums of money for legal representation to defend unwarranted criminal charges brought by the defendant against the plaintiff.

6.  As a further result of the aforesaid conduct on the part of the defendant herein the plaintiff has suffered a loss and depreciation in earning capacity.

WHEREFORE, the plaintiff herein demands a trial by jury and judgment and compensatory and punitive damages of the defendant herein, plus interest, costs and reasonable attorney's fees.

By her attorneys,

Chester L. Tennyson, Jr.,
BBO No. 494620
*clt@tennysonlaw.com*
Richard L. Tennyson
BBO No. 687572
*rlt@tennysonlaw.com*
Tennyson Law Firm
3 Seaview Ave.
Hull, MA 02045
(781) 740-7800

Dated: February 10, 2021

Exhibit 1

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.                              SUPERIOR COURT DEPARTMENT
                                          CIVIL ACTION NO.: 1883CV00461

```
_____
                             )
ABIGAIL LIVRAMENTO,          )
       Plaintiff,            )
                             )
v.                           )
                             )
CITY OF BROCKTON,            )
JOHN DOE 1,                  )
JOHN DOE 2,                  )
       Defendants.           )
                             )
_____)
```

## AFFIDAVIT OF ROBERT R. PUSINS

I, Robert R. Pusins, of Robert R. Pusins & Associates, Inc., do hereby depose and state the following:

1.  I was retained by Tennyson Law Firm to review the circumstances under which the Plaintiff, Abigail Livramento, was injured as the result of a high speed motor vehicle chase, initiated by Officer Lindsey Ferebee, on April 27, 2015.

2   I was asked to formulate opinions as to whether Officer Lindsey Ferebee and the Brockton Police Department acted in accordance with reasonable professional standards and generally accepted police practices and customs during the April 27, 2015 vehicular pursuit that ended in a crash of the fleeing vehicle and the death of two of the five occupants of that vehicle and injuries to the three occupants who survived.

3.  I was asked to formulate opinions regarding the Brockton Police Department pursuit policy, the training on the pursuit policy, and the supervision of officers who engaged in pursuits.

4.  As part of this process, I reviewed extensive documentation, including Plaintiff's Complaint, Plaintiff's Answers to Defendant City of Brockton's Interrogatories, Brockton Police Department's Narrative Report of the incident alleged in the Complaint, Brockton Police Department's Supplemental Report to the incident alleged in the Complaint, Massachusetts State Police Collision Reconstructionist Report, audio recordings of Brockton Police Department, video recordings from 213 Prospect Street, Brockton, MA and Brennon's Smoke Shop, 909 Main Street, Brockton, MA, Massachusetts general laws, a google map of the pursuit,

photographs of the crash scene, Brockton Police Department's High Speed Pursuit Policy, deposition transcripts of Lindsey Ferebee and Emanuel Gomes, and Defendant's present motion and supporting documents.

5.     The attached report summarizes my findings and conclusions in relation to the above.

Signed under the pains and penalties of perjury, this 9th day of February,

Robert Pusins

**Robert R. Pusins & Associates, Inc.**
*Police Practices & Procedures Experts*
www.robertpusins.com

171 SE 14th Street,
Pompano Beach, FL 33060
robertpusins@att.net
954-303-2169

February 1, 2021

Richard L. Tennyson, Esq.
Tennyson Law Firm
3 Seaview Avenue
Hull, MA 02045

RE:   Abigail Livramento v. City of Brockton, et al.

Plymouth Superior Court

Civil Action No.: 1883cv00461

Mr. Tennyson:

I have been retained by the Tennyson Law Firm in my capacity as an expert in police practices and procedures in the referenced case. I was tasked to analyze the case in order to offer opinions and conclusions as to the conduct of officers of the Brockton Police Department. Among other issues, I was asked to formulate opinions as to whether Officer Lindsey A. Ferebee and the Brockton Police Department acted in accordance with reasonable professional standards and generally accepted police practices and customs during the April 27, 2015 vehicular pursuit that ended in a crash of the fleeing vehicle and the death of two of the five occupants of that vehicle and injuries to the three other occupants who survived. I was also asked to formulate opinions regarding the BPD pursuit policy, the training on the pursuit policy and the supervision of officers who engaged in pursuits.

**Background**

Patrolman Lindsey A. Ferebee (Ferebee) of the Brockton Police Department (BPD) reported that on April 27, 2015, at approximately 2:41 am, while operating a marked police vehicle, he observed a motor vehicle commit a number of traffic infractions including the failure to stop at two stop signs, travelling at a speed greater than 30 mph,

Livramento v. City of Brockton, et al.

and failure to use a directional signal when turning. Ferebee activated the emergency lights of the police vehicle to stop the vehicle. The vehicle disregarded his emergency lights and continued to accelerate and fled from Ferebee.

Ferebee reported that he notified dispatch of what was transpiring, that he was travelling at 60 mph and that the reason for the pursuit was "Chapter 90" (Motor vehicle codes for the Commonwealth of Massachusetts). Ferebee further reported that he advised dispatch of the license plate information of the fleeing vehicle and continued to pursue while the fleeing vehicle failed to stop at four additional stop signs and one red light while travelling at a speed of at least 60 mph.

The audio recording of the police radio transmissions revealed that within 1 minute and 25 seconds from the start of the pursuit, the dispatcher advised that the Massachusetts license plate was registered to a Nissan Altima with the address of 54 Woodland Avenue, Brockton, MA.

The fleeing vehicle then travelled into the Town of Avon and subsequently crashed into a utility pole and all five occupants were ejected from the vehicle. Two of the occupants died and three occupants were injured, including Abigail Livramento.

The Massachusetts State Police conducted a post-crash investigation and concluded in their Collision Reconstruction Report that the fleeing vehicle was travelling at approximately 85 mph at the start of the skid that immediately proceeded the crash. The crash occurred in a 25-mph posted speed limit area.

The plaintiff, Abigail Livramento, who was injured in the crash, is now bringing forward her complaint.

In pursuing my analysis, I reviewed the following documents and materials, among others, relating to the case:
- Complaint (8 pages)

Livramento v. City of Brockton, et al.

- Plaintiff's Answers to Defendant City of Brockton's First Set of Interrogatories (10 pages)
- BPD Narrative Report 15-1521-AR by Patrolman Lindsey A. Ferebee (2 pages)
- BPD Supplemental Report 15-1521-AR by Patrolman Lucas M. Pedro (1 page)
- Massachusetts State Police Collision Reconstruction Report, 2015-CAR-000121 (18 pages)
- Audio Recordings of BPD Radio Transmissions (5)
- Video Recordings from 213 Prospect Street, Brockton (3)
- Video Recordings from Brennon's Smoke Shop, 909 Main Street, Brockton (30.16)
- General Law, Part I, Title XIV, Chapter 89, Section 7B (2 pages)
- Google Map of Pursuit Route (1 page)
- Photographs of Crash Scene (5)
- BPD High Speed Pursuit Policy (3 pages)
- Transcript of July 31, 2020 deposition of Lindsey Ferebee (62 pages)
- Transcript of November 20, 2020 deposition of Emanuel Gomes (104 pages)
- Defendant's Index of Exhibits (1 page)
- December 31, letter from City of Brockton with Statement of Material Facts and Defendant's Motion for Summary Judgment (16 pages)

**Methodology**

In the presentation of my opinions and conclusions, I relied upon and utilized the case materials identified above. I reached my opinions and conclusions by applying my specialized knowledge, skills, training, education and experience of over 35 years in law enforcement to the analysis and evaluation of the facts and information furnished to me. My opinions are provided with a reasonable degree of professional probability within the field of law enforcement and are intended to assist the trier of fact to understand the evidence and/or to determine a fact in issue.

This expert report may include the use of terminology that overlap with other accepted legal terms or standards. My use of specific legal terms, or standards is not intended to draw legal conclusions or to subvert the function of the court or to inappropriately

Livramento v. City of Brockton, et al.

influence triers-of-facts. Specific legal terms are commonly used in the field of law enforcement and it is in that context that I use those terms when discussing law enforcement issues with both law enforcement practitioners and civilian audiences when offering expert opinions.

I also considered publications from the International Association of Chiefs of Police (IACP)[1], the Police Executive Research Forum (PERF)[2], the Commission of Accreditation for Law Enforcement Agencies (CALEA)[3], the Massachusetts Police Accreditation Commission[4], (MPAC) and the U.S. Department of Justice (DOJ), as further objective guidance and supportive data in determining whether the actions of Ferebee in pursuing the fleeing vehicle were reasonable and consistent with widely accepted police practices and customs.

The IACP is a professional law enforcement association and for more than 120 years, the IACP has been launching internationally acclaimed programs, speaking on behalf of law enforcement, conducting groundbreaking research, and providing exemplary programs and services to members around the globe. Today, the IACP continues to be recognized as a leader in these areas. The IACP, through their National Law Enforcement Policy Center (Center), has been identifying leading practices and providing sound guidance for law enforcement agencies for over 30 years by addressing cutting edge issues confronting law enforcement through advocacy, programs, research, training, and other professional services.

The Center publishes Model Policies and Concepts and Issues Papers to provide guidelines, essential background material and supporting documentation to law enforcement agencies and officers, to provide greater understanding of the developmental philosophy and implementation requirements for the model policies. Reasonable law enforcement agencies and officers recognize that the Center makes

---

[1] Theiacp.org
[2] Policeforum.org
[3] Calea.org
[4] Masspoliceaccred.net

Livramento v. City of Brockton, et al.

every effort to ensure these papers and model policies incorporate the most current information and contemporary professional judgment on these issues.

The Center published a Model Policy and a Concepts and Issues Paper on Vehicular Pursuit; on Motor Vehicle Stops and on a Written Directive System, I considered these documents during my analysis of this case.

The Police Executive Research Forum (PERF), founded in 1976 as a nonprofit organization, is a police research and policy organization and a provider of management services, technical assistance, and executive-level education to support law enforcement agencies. PERF helps improve the delivery of police services through the exercise of strong national leadership; public debate of police and criminal justice issues; and research and policy development.

PERF published "Police Pursuits: What We Know"[5] by Dr. Geoffrey Alpert, a professor in the Department of Criminology and Criminal Justice at the University of South Carolina, who has been conducting research on high-risk police activities, including pursuit driving for more than 25 years and I considered this publication during my analysis of this case.

CALEA was created in 1979 as a credentialing authority through the joint efforts of law enforcement's major executive associations:
- The International Association of Chiefs of Police (IACP)
- National Organization of Black Law Enforcement Executives (NOBLE)
- National Sheriff's Association (NSA); and the
- Police Executive Research Forum (PERF)

CALEA's purpose was to establish a body of professional standards and to develop an accreditation process to administer its initial credentialing program, Law Enforcement

---

[5] Alpert, G., Kenney, D., Dunham, R. & Smith, W. (2000). *Police pursuits: What we know.* Washington, DC: Police Executive Research Forum.

Livramento v. City of Brockton, et al.

Accreditation. This accreditation program strengthens an agency's accountability, both within the agency and the community, through a continuum of standards that define clear authority, performance and responsibilities.

Even though the BPD is not an accredited agency and it is not required for an agency to be accredited, CALEA published standards relating to the Pursuit of Motor Vehicles (41.2.2) and I considered this document during my analysis of this case.

The Massachusetts Police Accreditation Commission, originated in 1996 through the combined efforts of the Massachusetts Chiefs of Police Association, the Massachusetts Police Accreditation Coalition and the Executive Office of Public Safety, administers the Massachusetts Police Accreditation Program and offers an accreditation process for police agencies across the Commonwealth. Like other accreditation programs, the process consists of two major components: (1) the establishment of a body of professional standards for police agencies to meet, and (2) a voluntary assessment process by which agencies can be publicly recognized for meeting those standards considered *best practices* for the profession.

Even though the BPD is not an accredited agency and it is not required for an agency to be accredited, the MPAC published standards relating to the Pursuit of Motor Vehicles (41.2.2) and I considered this document during my analysis of this case.

**Discussion:**
The IACP in their Model Policy and Concepts and Issues Paper on a Written Directive System[6] states that the essential functions of policy and procedures is to "inform officers of what is expected of them in the performance of their duties, provide guidance to them in performing such duties, and establish the basis for employee accountability and the means to fairly evaluate officer and unit performance".

The Concepts and Issues Paper on a Written Directive System further states:

---

[6] IACP Model Policy and Concepts and Issues Paper, Written Directive System, 2002

Livramento v. City of Brockton, et al.

1. "Training supervision, discipline and rewards, inspectional services, and related activities that flow from policy play important additional roles."
2. "Training materials should be built upon and consistent with agency policies, procedures and rules."
3. "To establish and maintain a professional written directive system, a police department must employ a systematic process for development, review, and update of policies, procedures, and rules."
4. "Most of the police policies that could be considered "essential" have been the subject of model policy development by the IACP National Law Enforcement Policy Center."
5. "Procedures should provide officers with the details of how to proceed with a given task, assignment, or situation, and what should and should not be done in certain circumstances."
6. "It is the primary responsibility of the department's CEO, policy manager, and other department employees to remain abreast of such changes and be prepared to suggest changes in policy where required."

Reasonable officers, including police chiefs, know that recognized current and best police practices and clearly established law guide policies; policies guides training and training guides operations. They also know that effective policies, the training on those policies and the supervision and oversight of operations are essential to support effective decision making by officers.

Reasonable officers, including police chiefs, also know that officers will confront situations involving pursuit decisions, that the decision to pursue or to continue a pursuit can be a difficult decision when the pursuing officer is emotionally invested in the goal to apprehend the offender and that the wrong choices can lead to preventable and avoidable crashes resulting the serious injuries and even death to all involved parties, including innocent third parties.

Livramento v. City of Brockton, et al.

The IACP in their Model Policy on Vehicular Pursuit[7], defines a vehicle pursuit as "an active attempt by an officer in an authorized emergency vehicle to apprehend a fleeing suspect who is actively attempting to elude the police".

The IACP Model Policy further states "Pursuit is authorized only if the officer has a reasonable belief that the suspect, if allowed to flee, would present a danger to human life or cause serious injury. In general, pursuits for minor violations are discouraged"; "The decision to initiate a pursuit must be based on the pursuing officer's conclusion that the immediate danger to the officer and the public created by the pursuit is less than the immediate or potential danger to the public should the suspect remain at large"; and "Unless a greater hazard would result, a pursuit should not be undertaken if the subject(s) can be identified with enough certainty that they can be apprehended at a later time".

Reasonable officers know that pursuits are one of the most dangerous activities an officer can undertake and that pursuits are inherently dangerous to the public. Such reasonable officers know that violent crime offenders pose an immediate or potential danger to the public should they have the opportunity to reoffend as they have already demonstrated a propensity for violence. Conversely, reasonable officers also know that the risk posed to the public by offenders of minor traffic related violations is much less than the immediate or potential danger to the public, including any passengers in the fleeing vehicle, and the pursuing officers, that is created by the pursuit itself.

Dr. Geoffrey Alpert, in his PERF publication *Police Pursuits: What We Know*, states "The basic dilemma of pursuit can be reduced to a balance between law enforcement and public safety. If law enforcement's only concern was to apprehend violators, then all pursuits would be appropriate. Any negative consequences such as an accident, injury or death would be an unfortunate, but acceptable outcome. If law enforcement's primary concern was public safety, then the immediate need to catch a suspect would be a

---

[7] IACP Model Policy and Concepts and Issues Paper, Vehicular Pursuit, 1996 & 2015

Livramento v. City of Brockton, et al.

minor consideration. In other words, the morality of pursuit and the mission of police must be considered in the equation of whether the benefit of pursuit is worth the cost."

Alpert includes in his model policy on pursuits the "seriousness of the offense" as a factor to be considered when making a pursuit decision: "Pursuit is justified only when an officer knows or has reasonable grounds to believe that the fleeing suspect has committed or attempted to commit a violent felony". Alpert's model policy is consistent with the generally accepted police practices on pursuits that allows pursuits for known violent felony offenders but prohibits pursuits for lesser offenses and violations.

In May 2017, the U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, (NCJ 250545) published a Special Report on Police Vehicle Pursuits[8] and reports that from 1996 – 2015, there were 7,090 pursuit related fatalities in the United States. The report indicates that there were 114 pursuit related fatalities within the Commonwealth of Massachusetts, with only 18 states having a higher number of pursuit related fatalities than Massachusetts. While the report does not address the number of people who have been injured from pursuit-related crashes, there can be no question that police pursuits are inherently dangerous and high-risk events that pose an immediate and potential danger to the public, the pursuing officers, the fleeing offender and any passengers in the fleeing vehicle.

CALEA published standards relating to the Pursuit of Motor Vehicles (41.2.2) and the MPAC adopted the exact same language in their standard (41.2.2) related to the pursuit of motor vehicles. These standards represent the best practices related to life, health and safety procedures for agencies and are considered foundational for contemporary law enforcement agencies.

Agencies demonstrate compliance with the requirements of each CALEA and MPAC standard when the language of their policy (in this case, the pursuit policy) and proof of their actual practice, meets the requirements listed in the standard. As I will discuss

---

[8] U.S. Department of Justice; NCJ 250545, May 2017

Livramento v. City of Brockton, et al.

later, I did consider the CALEA and MPAC standards when I evaluated the BPD High Speed Pursuit policy, procedures, guidelines, training and supervision provided by the BPD that are related to police pursuits as part and parcel of my consideration as to whether the decision of Ferebee to initiate and continue the pursuit of the fleeing vehicle was reasonable and consistent with generally accepted police practices regarding police pursuits.

### Professional Opinions/Conclusions and Basis for Opinions

**Issue One: Whether the Brockton Police Department's High-Speed Pursuit policy was reasonable and consistent with generally accepted police practices regarding pursuit policies?**

My analysis of the BPD High Speed Pursuit policy shows that the policy is deficient in that the policy:

1. Fails to include or address the requirement for the initiating officer to evaluate the circumstances before initiating a pursuit and to continually reevaluate these factors during the pursuit and the reasonableness of continuing the pursuit.
2. Fails to include or designate the secondary unit's responsibilities.
3. Fails to include dispatcher's responsibilities.
4. Fails to address the issue of engaging in interjurisdictional pursuits involving personnel from the agency and/or other jurisdictions.
5. Fails to require an administrative review of each pursuit.
6. Fails to require an annual, documented analysis of those reports.

Chief Gomes testified in his deposition that:

1. The Training Division fell under his command when he was a captain (11:7-12)
1. He is not really sure when the 2008 BPD pursuit policy was last updated (13:22 – 14:4)
2. He had no role in updating the policy since it was first adopted (15:3-8)
3. He has never suggested any amendments to the pursuit policy (15:16-18)

Livramento v. City of Brockton, et al.

4. Any motor vehicle violation would allow officers to initiate a pursuit (20:14 – 22:22)

5. The policy does not require officers to terminate the pursuit under certain circumstance (32:21 – 33:3)

6. There is no written directive that prohibits pursuit of a motor vehicle infraction (34:16-21)

7. There is no annual audit of pursuit reports (57:21-24); (63:14-19)

8. The policy does not require an administrative review of each pursuit (62:21-23)

9. The policy does not contain any prohibitions on when to pursue (65:12-16)

10. The policy does not contain guidance on when and under what circumstances an officer can pursue (65:17-21)

11. He is a member of the IACP but is not aware of any IACP model policies (70:11-14)

12. Would look for a "local aspect" for guidance on policies (71:6-17)

13. Never compared the BPD pursuit policy with CALEA or other state policy (74:19-24)

14. That he never heard of the Massachusetts Police Accreditation Program (75:7-11)

15. That the BPD has no review of pursuits beyond a supervisor's review of the report (75:16-24)

16. That he is not aware of any officer who has been reprimanded or disciplined in any fashion for initiating a high-speed pursuit (89:24 - 90:10)

17. Agrees that if the danger to the community, to officers or to the suspects is greater that the necessity for immediate apprehension that the pursuit should not be initiated or if initiated, the pursuit should be terminated (92:4-10)

18. The policy gives complete discretion to the officer to pursue for a motor vehicle violation (100:11-16)

The failure for the BPD policy to include all of the requirements as noted above including a critical requirement that the officer who is considering whether or not to initiate a pursuit to evaluate the circumstances and the risks and benefits of engaging in a pursuit before initiating a pursuit, including whether the need to apprehend the fleeing

Livramento v. City of Brockton, et al.

suspect is greater than the risk presented by the pursuit, is unreasonable, not consistent with generally accepted police practices regarding pursuits.

In a common sense risk analysis, the death or serious injury to an officer or innocent citizen, including passengers in fleeing vehicles who have no control over the actions of the driver, does not equate to the need to apprehend a motorists suspected of committing a property crime or a traffic offense.

A reasonable policy should include language that requires the pursuing officer to reach the conclusion prior to initiating a pursuit that the imminent threat of death or grave bodily harm to the officer and the public created by the pursuit is less than the immediate or potential danger to the public should the suspect remain at large as well as come into compliance with the pursuit policy standards established by the Massachusetts Police Accreditation Commission.

**Conclusion:**
It is my opinion that the plain, ordinary, customary and generally accepted meaning of the language in the BPD High Speed Pursuit Policy, last updated in October 2008, fails to meet the generally accepted police practices regarding pursuit policies and fails to meet the CALEA standards regarding pursuits. Further, the policy fails to meet the standards established by the Massachusetts Police Accreditation Commission regarding pursuits.

The failure of the BPD to have a pursuit policy that meets generally accepted police practices regarding pursuits is unreasonable and not consistent with generally accepted police practices regarding pursuits. Further, a policy that allows officers to have unfettered discretion and to pursue for whatever reason, including minor traffic violations, creates a substantial and unjustified risk to the lives, safety and rights of others and demonstrates a wanton and willful disregard for or indifference to that risk and that is a gross deviation from the standard of care that a reasonable person would exercise in like circumstances.

Livramento v. City of Brockton, et al.

The BPD policy should be reviewed on an annual basis and updated to be current consistent with generally accepted police practices regarding pursuit policies, including the standards established by the Massachusetts Police Accreditation Commission regarding pursuits. The fact that the BPD pursuit policy that was still current in 2015 and had not been undated since 2008 is evidence that the BPD failed to conduct an annual review of the policy and this was unreasonable and not consistent with generally accepted police practices regarding the review of pursuit policies.

**Issue Two: Whether the Brockton Police Department provided adequate training to officers on the pursuit policy and in safe driving tactics?**

The IACP Model Policy on Vehicular Pursuit  states "Officers who drive police vehicles shall be given initial and periodic update training in the agency's pursuit policy and in safe driving tactics".

The IACP Concepts and Issues Paper on Vehicular Pursuits further states "The key to abiding by accepted pursuit policy and honing driving skills is training. This means training of all agency personnel who may be engaged in a vehicular pursuit and training of all supervisors and communications personnel who may be called upon to perform their functions in relation to such pursuits. This should consist of initial training prior to exposure of personnel to pursuit situations and updated training at regular intervals. The periodic update training should cover any interim changes in agency policy affecting pursuits and the use of any new equipment that has been added to the agency's inventory".

Reasonable officers and police agency's also know that it is predictable and foreseeable that officers will become involved in vehicular pursuits and that officers must have initial and updated training at regular intervals to ensure that the policy is followed, that officers' actions will have supervision oversight and that policy violations will have disciplinary consequences.

In this case, Ferebee testified in his deposition that:

Livramento v. City of Brockton, et al.

1. He had no training in the academy on when to engage in a pursuit and when to terminate a pursuit (49:1-5)
2. Aside from academy training, he had no other training on pursuits (49:6-8)
3. He did not receive any training from the BPD on when to engage in a pursuit or when to terminate a pursuit (49:13-17)
4. His training was all tactical training, how not to crash, when to brake (50:6-9)
5. He never received training regarding the need to apprehend is more important that the risk of the pursuit and he did not receive that training in the academy or anywhere else (54:18 55:2)
6. He was not trained in considering whether the danger of the pursuit exceeded the danger of the pursuing vehicle escaped (55:3-8)

Police Chief Gomes testified in his deposition that:

1. The Training Division was under his command when he was a captain (11:3-12)
2. Responded "Well, officers receive some driver training" when asked if officers are provided guidance on how to weigh the risk to life and property versus the benefit derived from immediate apprehension or continued pursuit. (31:1-14)
3. There is no training to supervisors on how to weigh the risks to life and property versus the need for immediate apprehension or continued pursuit (53: 8 – 54:12)
4. There is no annual audit on pursuit reports (57:21-24)
5. The policy does not require an administrative review of each pursuit (63:14-19)
6. In-service training does not cover high-speed pursuits or best practices in high-speed pursuits (67:4-9)

**Conclusion:**

Based on the testimony of Ferebee and Chief Gomes, there is no evidence that the BPD provided any guidance and training to officers and supervisors on pursuits, or updated training at regular intervals on pursuits. And there is no evidence that the agency provided any guidance and training to officers and supervisors, or provided updated training to officers and supervisors, at regular intervals, on evaluating the circumstances when deciding to initiate a pursuit and when to terminate a pursuit.

Livramento v. City of Brockton, et al.

Accepting the testimony of Ferebee and Chief Gomes as accurate and truthful in that they testified they did not recall, receive or provide any training on pursuits to officers of the BPD and in the absence of any evidence that the BPD did provide such training to officers, I must conclude that the BPD failed to train officers on pursuits, a predictable police activity and function, that are inherently dangerous and high-risk events that pose an immediate and potential danger to the public, the pursuing officers, the fleeing offender and any passengers in the fleeing vehicle.

This is unreasonable, not consistent with generally accepted police practices regarding the training of officers on the issues of pursuits and represents a deliberate indifference to the risks associated with the dangerous and high-risk police function of pursuits that requires a critical balance between the department enforcement objectives and community protection. Further, this failure exhibits a wanton and willful disregard for the safety of the public, the pursuing officers, the fleeing offender and any passengers in the fleeing vehicle. The BPD should have provided such training to their officers.

**Issue Three: Whether the decision of Ferebee to pursue the fleeing vehicle was reasonable and consistent with generally accepted police practices regarding police pursuits?**

To determine whether the decision by Ferebee to initiate a pursuit and to continue to pursue was reasonable and consistent with generally accepted police practices, I considered whether his decision was objectively reasonable under the totality of circumstances, relying on the perspective a reasonable officer present at the scene, rather than the 20/20 vision of hindsight and in light of the facts and circumstances confronting him.

In this case, Ferebee wrote in his police report that he on April 27, 2015, at approximately 2:41 A.M. that he initially observed the vehicle stopped in the middle of Nye Avenue. He then observed that the vehicle failed to stop at a stop sign, was travelling at a speed greater than 30 mph, then accelerated while making a turn while failing to use its directional signal, and failed to stop at another stop sign. Ferebee further wrote that "Due to these infractions, I activated my emergency lights to affect a

Livramento v. City of Brockton, et al.

motor vehicle stop. The operator disregarded my lights and continued to accelerate as he sped through the intersection, crossing over Pleasant St while ignoring another stop sign". At this point, it was evident that the driver of the fleeing vehicle was actively attempting to elude apprehension and that Ferebee was in pursuit of the vehicle.

The alleged violations noted by Ferebee in his police report (failing to stop at stop signs, traveling at a speed greater than 30 mph and failure to use a directional indicator) would be considered minor traffic violations and less serious offenses than a crime against a person and were not violent felonies or a crime against another person. There was no information or indication that the alleged violations involved a crime against a person, were a violent felony, or involved any act of violence.  Further, Ferebee wrote in his report that when asked by Sergeant Maker for his speed and the reason for the pursuit that he stated "Chapter 90, 60 mph. (Chapter 90 refers to Massachusetts General Laws regulating motor vehicles and aircraft and contains 62 separate sections and numerous subsections)

Ferebee testified in his deposition that:

- The only information he had about the driver's violations would be motor vehicle violations (19:7-10; 22:12-17)

- He realized there was at least one person in the back seat of the fleeing vehicle (20:24-21:12)

- The entire pursuit was in a 30-mph zone (22:14-21)

- The fleeing vehicle accelerated to approximately 60 mph (23:24-24:1)

- His best estimate was that the fleeing vehicle was going 65,70 and increasing (25:16-18)

- He estimated the fleeing vehicle to be travelling at 75-plus (26:22-27:1)

- He would agree with the Massachusetts State Police reconstructionist's opinion that the fleeing car was doing about 85 mph before the crash (27:6-11)

Livramento v. City of Brockton, et al.

- Agreed that the fleeing vehicle was travelling at pretty close to triple the speed limit right before the crash (47:16-48:1)

- Agreed there was a risk to serious injury or death to people in the area and to the occupants of the car that he was pursuing (53:4 – 14)

- It was clear to him that the fleeing vehicle was not going to stop, that it was going through stop signs and red lights and going faster at the end of the pursuit than he was earlier (56:14-18)

- That the City of Brockton protocols concerning pursuits is that "if they get too dangerous, speeds -- when the supervisor says keep me updated with speeds greater than – dangerously high, they terminate them (57:19-58:1)

- He did not consider what the driver was doing, driving 60, 65 miles an hour through the city street as something dangerous on that date (58:19-23)

- That the driver was not erratic, not reckless (59:2)

- He knew during the pursuit that the driver was posing a danger to himself or occupants in his car by driving 60, 70 miles an hour and that he was putting his occupants at the risk of serious injury or death (59:3 – 19)

Reasonable officers know and understand from research on pursuits, as reported by Alpert, that drivers who are being pursued by the police, more likely than not, will increase their speed and recklessness to escape. They also know and understand that if police end a chase, the suspects are likely to slow down once they feel safe. In this case, the driver of the fleeing vehicle is clearly increasing his speed and recklessness as he reached an estimated 85 mph in a 30-mph zone while failing to stop and stops signs and at least one red light.

The decision to pursue the vehicle for alleged minor traffic violations was also not consistent with Alpert's Model Policy on Pursuits that states: "Pursuit is justified only when an officer knows or has reasonable grounds to believe that the fleeing suspect has committed or attempted to commit a violent felony".

Livramento v. City of Brockton, et al.

**Conclusion:**

It is my opinion that the decision to pursue the fleeing vehicle at speeds of at least 60 mph and possibly as much as 85 mph, as concluded by the Massachusetts State Police, while traveling in a 25-mph zone, for failing to stop at a stop sign and for failure to using the directional signal when making a turn, all minor traffic violations, was unreasonable, and not consistent with generally accepted police practices regarding pursuits.

Further, to pursue a vehicle at such speeds for minor traffic violations, created a substantial and unjustified risk to the lives, safety and rights of others and demonstrated a wanton and willful disregard for or indifference to that risk and that is a gross deviation from the standard of care that a reasonable person would exercise in like circumstances.

Also, Ferebee testified that he recognized that the driver was posing a danger to himself or occupants in his car by driving 60, 70 miles an hour, and agreed that he was driving almost triple the post speed limit and that he was putting his occupants at the risk of serious injury or death.

Additionally, Ferebee failed to articulate, either in his written police report or in his deposition testimony, nor does the record reflect, any exigent need to apprehend the driver of the fleeing vehicle because of the potential harm or risk to the public; and he failed to articulate that it was his conclusion that the imminent threat of death or grave bodily harm to the officer of the public created by the pursuit was less than the immediate or potential danger to the public should the driver remain at large.

Consequently, I must conclude and it is my opinion that the pursuit itself created a substantial and unjustified risk to the lives, safety and rights of others that far outweighed the need to make an immediate apprehension of a minor traffic violator and Ferebee should not have initiated a pursuit of the Nissan Maxima for the noted minor traffic violations.

Livramento v. City of Brockton, et al.

**Issue Four: Whether the decision by Ferebee to continue the pursuit was reasonable and consistent with generally accepted police practices regarding pursuits?**

Reasonable officers know and understand that as noted by the IACP when deciding whether to terminate the pursuit, the officer shall take the following into consideration:

- "The primary unit and supervisor shall continually reevaluate and assess the pursuit situation including all of the initiating factors and terminate the pursuit whenever it is reasonable to believe the risks associated with continued pursuit are greater than the public safety benefits of making an immediate apprehension".

- "The pursuit may be terminated by the primary unit at any time"

- A supervisor may order the termination of the pursuit at any time".

- "A pursuit should be terminated if the suspect's identity has been determined, immediate apprehension is not necessary, and apprehension at a later time is feasible".

Ferebee wrote in his police report that:

1. The fleeing vehicle disregarded three (3) stops signs
2. Ferebee was travelling at 60 mph
3. The fleeing vehicle disregarded three (3) additional stop signs while travelling at 60 mph
4. The fleeing vehicle disregarded a red light.

Ferebee testified in his deposition that:

1. All violations were motor vehicle violations (19:7)
2. That he gave the license plate information to the dispatcher (19:19)
3. He realized there was at least one person in the back seat (20:24-21:2)
4. The fleeing vehicle was going 75 mph at the time of the crash (27:1)
5. The fleeing vehicle hit speeds of 65, 70 mph (25:18)

Livramento v. City of Brockton, et al.

6. That he did not have any knowledge that the driver had committed any crime (47:3)

7. He remembered seeing a pedestrian (50:17)

8. Admitted he could have terminated the pursuit (52:1)

9. Was aware that there was a risk to serious injury or death to people in the area and occupants of the fleeing vehicle (53:4)

10. He had no information that the passengers have done anything wrong (53:15)

11. He knew of at least one person in the back seat (53:19)

It also should be noted that the dispatcher provided the address of the registered owner of the vehicle, at the approximate 1 minute and 25 seconds mark of the pursuit, as register to 54 Woodland Avenue, Brockton, MA. which would allow for a follow-up investigation as to the identity of the driver should Ferebee terminate the pursuit.

It also should be noted that video recordings from multiple surveillance cameras show additional vehicles on the roadways during the time of the pursuit which only increases the risk to all involved parties including the public.

**Conclusion:**

For all of the above reasons, it is my opinion that a reasonable officer would have reevaluated all of the factors involved in this pursuit, including the reasonableness of continuing the pursuit, and would have terminated the pursuit. The failure of Ferebee to discontinue this pursuit was unreasonable, was not consistent with generally accepted police practices regarding pursuits and demonstrated a wanton and willful disregard for or indifference to the risk of the pursuit and that is a gross deviation from the standard of care that a reasonable person would exercise in like circumstances. Ferebee should have discontinued or terminated the pursuit.

**Issue Five: Whether the decision by Sergeant Maker to authorize a police pursuit for minor traffic offenses and to allow such a pursuit to continue was reasonable and consistent with the BPD pursuit policy and generally accepted police practices regarding pursuits?**

Livramento v. City of Brockton, et al.

As discussed above, reasonable officers and especially supervisors, know and understand as noted by the IACP that "Pursuit is authorized only if the officer has a reasonable belief that the suspect, if allowed to flee, would present a danger to human life or cause serious injury. In general, pursuits for minor violations are discouraged"; and that "The decision to initiate a pursuit must be based on the pursuing officer's conclusion that the immediate danger to the officer and the public created by the pursuit is less than the immediate or potential danger to the public should the suspect remain at large".

Also, reasonable officers, and especially supervisors, know and understand that as further noted by the IACP when deciding whether to initiate or continue a pursuit, the officer shall take the following into consideration: "Unless a greater hazard would result, a pursuit should not be undertaken if the subject(s) can be identified with enough certainty that they can be apprehended at a later date".

The IACP Model Policy on Vehicular Pursuit states under Supervisory Responsibilities: "When made aware of a vehicular pursuit, the appropriate supervisor shall monitor incoming information, coordinate and direct activities as needed to ensure proper procedures are used, and shall have the discretion to terminate the pursuit".

Alpert's model policy on police pursuits elements states: "A supervisor may override an officer's decision to continue a pursuit at any time" and that "Standards applied to pursuit evaluation, as well as the decision to continue a pursuit, shall include the following:

- If the pursuit were to result in injury or death, would a reasonable person understand why the pursuit occurred or was necessary?

- Is the need to immediately catch the suspect more important than the risk created by the pursuit?

- Do the dangers created by the pursuit exceed the danger posed by letting the perpetrator escape?"

Livramento v. City of Brockton, et al.

The BPD Policy states under Responsibilities of the Patrol Supervisor that "If, by observing the actual pursuit or monitoring the radio communications of the pursuit, the patrol supervisor feels that, in his opinion, the dangers created by the pursuit outweigh the need for immediate apprehension, he shall order that the pursuit be immediately terminated".

To determine whether the decision by Maker, as the supervisor of Ferebee, to allow the pursuit to continue and to not order the termination of the pursuit, violated the BPD pursuit policy, I considered whether his decision was objectively reasonable under the totality of circumstances, relying on the perspective of a reasonable officer present at the scene, rather than the 20/20 vision of hindsight and in light of the facts and circumstances confronting him.

**Conclusion:**

As stated, when discussing Issues Three and Four, it is my opinion that it was unreasonable for Ferebee to initiate this pursuit and it was also unreasonable for Ferebee to continue the pursuit. It is also my opinion that Maker, as the supervisor who was supervising and monitoring the pursuit, had the duty and responsibility to evaluate the situation and conditions that caused the pursuit to be initiated, the need to continue the pursuit, and to monitor incoming information, and to coordinate and direct activities as needed to ensure that proper procedures are followed. He also had the responsibility to determine if the pursuit should be allowed to continue or to terminate the pursuit.

In this case, the evidence is clear that Sergeant Maker was aware that Ferebee was pursuing the fleeing vehicle not for committing a violent felony but rather for minor traffic related offenses and that Ferebee and the fleeing vehicle were hitting excessive speeds of at least 60 mph within a 30-mph zone. The evidence is also clear that Ferebee was able to obtain the license plate information and was told that the vehicle was registered to an address in Brockton. Such information would allow for a follow-up investigation should the pursuit be terminated or should the driver elude the pursuing police.

Livramento v. City of Brockton, et al.

Based on the totality of circumstances, this pursuit created an unreasonable danger to the public and Maker should have terminated the pursuit by communicating that order to Ferebee. Maker failed to do so and allowed the pursuit to continue until the pursuit was terminated with the crash. His decision to allow the pursuit to continue was objectively unreasonable, reckless, negligent and not consistent with widely accepted police practices regarding the supervision of pursuits.

It is also my opinion that it is more likely than not that the crash would not have occurred had Maker terminated the pursuit as Alpert's research has shown that "if the officer continues to pursue, it is likely that the suspect will continue to flee. If the officer terminates the chase by turning off emergency equipment, however, the suspect will likely slow down after a short distance and reduce the risk to the public".

It is my opinion that the decision by Sergeant Maker to authorize the pursuit was not reasonable and was not consistent with generally accepted police practices regarding the supervision of pursuits. Maker should not have authorized the pursuit and should have directed Ferebee to discontinue and to terminate his pursuit.

**Issue Six: Whether the BPD conducts an administrative review of each pursuit?**

The IACP Model Policy and the Concept and Issues Paper on Vehicle Pursuits as well as the CALEA standards and the MPAC standards on pursuits, require an administrative review of each pursuit to ensure that the pursuits are conducted within policy and to identify any modifications that need to be made to the agency's pursuit policy, training, equipment, philosophy approach, and interjurisdictional issues. Given the frequency and regularity of pursuits, it is inevitable that officer error and misconduct will sometimes be a factor requiring disciplinary action.

In this case, Chief Gomes testified in his deposition that:

1. Supervisors review and approve reports and may make a correction at the shift level or send the report to Internal Affairs. (57:13-20)
2. The policy does not require an administrative review of each pursuit (62:14-19)

Livramento v. City of Brockton, et al.

3. There is no other review of a pursuit beyond a supervisors review of the report (75:21-24)
4. He is not aware of any officer who has been reprimanded or disciplined in any fashion for initiating a high-speed pursuit (90:6-10)
5. The BPD pursuit policy gives complete discretion of officers to pursue for motor vehicle infractions (100:11-15)

**Conclusion:**

It is my opinion that the BPD does not conduct any administrative review of pursuits beyond having a supervisor approve a pursuit report, and this is unreasonable and not consistent with generally accepted police practices regarding the review of pursuits. Further, the failure to conduct administrative reviews of pursuits leads to a lack of officer accountability as officers can conduct pursuits at their own unfettered discretion, no matter how unreasonable it may be to initiate and continue a pursuit and without fear of disciplinary consequences.

The testimony of Chief Gomes that he is not aware of any officer who has been reprimanded or disciplined in any fashion for initiating a high-speed pursuit makes it abundantly clear that the BPD does not hold officers accountable for initiating and continuing unreasonable pursuits or violating any element of the pursuit policy and this places the community and all involved in pursuits at grave risk to serious bodily injury or death.

The BPD should conduct an administrative review of each pursuit to ensure that pursuits are conducted within policy and should take disciplinary action when members of the agency violate the pursuit policy and the failure to do so is unreasonable, not consistent with generally accepted police practices regarding pursuit review.

**Issue Seven: Whether the BPD conducts an annual analysis of all pursuit reports?**

The IACP Model Policy and the Concept and Issues Paper on Vehicle Pursuits as well as the CALEA standards and the MPAC standards on pursuits, require an annual documented analysis of all pursuits to ensure that the pursuits are conducted within

Livramento v. City of Brockton, et al.

policy, to identify any modifications that need to be made to the agency's pursuit policy, training, equipment, philosophy approach, and interjurisdictional issues.

The BPD High Speed Pursuit policy does not require such an annual review and Chief Gomes testified in his deposition that the BPD does not conduct an annual audit of pursuit reports. (57:21)

## Conclusion:

It is my opinion that the BPD does not conduct an annual review, audit or analysis of pursuits and this is unreasonable, not consistent with generally accepted police practices regarding pursuits. The BPD should conduct an annual documented analysis of all pursuits to ensure that the pursuits are conducted within policy, to identify any modifications that need to be made to the agency's pursuit policy, training, equipment, philosophy approach, and interjurisdictional issues.

## Closing Comments:

Reasonable officers know that pursuits are dangerous and high-risk events that pose an immediate and potential danger to the public, the fleeing offender and any passengers in the fleeing vehicle, the pursuing officer(s) and to any additional responding field units. Law enforcement agencies are responsible to use policy, training, supervision, discipline and technology to manage these risks and balance the need for criminal apprehension with the need to protect the public.

In this case, Ferebee was aware that the fleeing vehicle was operating at a high rate of speed and in an increasingly reckless manner while being pursued for minor traffic related violations, and that the pursuit itself was creating an immediate or potential danger to the public, a danger that far outweighs the danger to the public should the fleeing driver remain at large.

Although Ferebee was clearly aware that the increasingly excessive speed and increasing recklessness of the driver of the fleeing vehicle was creating a clear and present danger to the public and that it was foreseeable that a crash was inevitable,

Livramento v. City of Brockton, et al.

causing likely serious injuries and possibly death, Ferebee continued the pursuit without abatement.

And the BPD failed to properly supervised Ferebee during this pursuit by allowing the pursuit to continue and failed to conduct an administrative review of this pursuit and failed to conduct an annual analysis of pursuits by members of the department.

And, as discussed in this report, the BPD Pursuit Policy was deficient and failed to provide appropriate guidance and instruction to officers regarding pursuits. And, if the policy is deficient, any training on a deficient policy would also be deficient.

Finally, this crash that ended the life of two of the occupants of the vehicle and caused serious and life-threatening injuries to the surviving occupants was unnecessary, predictable and foreseeable. If the crash was predictable and foreseeable, it was preventable.

This concludes my findings, conclusions, and opinions at this time. Please contact me should you have any questions or require more information.

Very truly yours,

*Robert R. Pusins*

**Robert R. Pusins & Associates, Inc.**
*Police Practices & Procedures Experts*
www.robertpusins.com

171 SE 14th Street,
Pompano Beach, FL 33060
robertpusins@att.net
954-303-2169

# Robert R. Pusins

*CURRICULUM VITAE*

## PROFESSIONAL EXPERIENCE

**Robert R. Pusins & Associates, Inc., Pompano Beach, FL, 1997 – present**
I have been serving as a consultant to attorneys as an expert in police practices and procedures since 1997 and consulted on cases including use of force, deadly force, police pursuits, arrests, policies and procedures, police tactics, crime prevention and hiring and retention.

I have been retained in civil and criminal cases for federal and state courts in Alabama, Arizona, Connecticut, Florida, Idaho, Iowa, Illinois, Kansas, Kentucky, Louisiana, Massachusetts, Michigan, Mississippi, Missouri, Montana, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Vermont, Washington, DC, West Virginia and Canada.

**Broward Sheriff's Office, Fort Lauderdale, FL, 2013 – 2018**
I served on the Sheriff's executive command staff as the Executive Director of the Department of Community Services for the Broward Sheriff's Office, the largest fully accredited public safety agency in the United States with over 5,500 employees.

Provided executive level oversight for a wide range of command and administrative activities including spearheading the development and full implementation of the Civil Citation Program, the Homeless Outreach Team (awarded the International Association of Chiefs of Police 2014 Civil Rights Award) and the Crisis Intervention Team (CIT).

I directed the operation of the Broward Sheriff's Office Regional Communications Division that provides E-911 services and law enforcement and fire rescue dispatch services for 29 municipalities and the special patrol areas of the Fort Lauderdale-Hollywood International Airport, Port Everglades, and the Department of Detention. The Division averages over 2.5 million emergency and non-emergency calls per year, over 200,000 calls per month and over 6,500 calls per day through 450 full-time employees including call taking, dispatch, teletype, supervision, quality assurance, audio evidence, training and administrative positions through an annual budget of over $40 million.

**Fort Lauderdale Police Department, Fort Lauderdale, FL, 1974 – 2004**
I retired from the Fort Lauderdale Police Department with more than 30 years of progressive law enforcement experience in an accredited agency with staffing of over 500 sworn police officers. I have advanced through the ranks and held the titles of police officer, field training officer, detective, sergeant, captain, commander, major and assistant police chief, and spent over 20 years in supervision, command and management positions, serving in the Operations, Investigative and Administrative Bureaus.

My command responsibilities included the examination of allegations of police misconduct ranging from use of force, violations of policy and procedures, police pursuits, K-9 apprehensions, and police vehicle crashes. I was involved in policy review and development for over 15 years and have extensive training and experience in assessing personnel and policies for law enforcement agencies. Further, I have been certified and served as an assessor for the Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA).

*Major, Community and Operations Support Divisions, 2001 – 2004*
Oversaw all community policing initiatives and crime prevention programs as well as a wide range of activities including high risk units. Specific command responsibilities included SWAT, K-9 Units (including criminal apprehension, narcotic detection, and explosive detection dogs), the Bomb Unit, Traffic Homicide, Traffic Enforcement, the Marine Unit, the Mounted Unit, Crime Prevention, the Dive Team, School Resource Officers and the Honor Guard.

*Assistant Chief, Operations Bureau, 2000 – 2001*
Appointed as an assistant chief and directed the overall management of the Operations Bureau including all uniformed patrol services. Staff totaled over 300 personnel including three district commanders as direct reports, captains, sergeants, police officers and civilian personnel.

*Commander, Operations Bureau, Patrol Division, 1996 – 2000*
Directed the delivery of all uniformed patrol services in the most diverse district of the city, a community of 46,000 residents encompassing the entire downtown and the Midtown community. Staff included three captains as direct reports and 115 employees.

*Captain, Support Services Bureau, Staff Support Division, 1992 – 1996*
Commanded eight departmental units: Training, Records, Recruiting & Hiring, Civil Forfeitures, Evidence, Property, 115 bed Detention Facility,  and Court Liaison. Staff included seven direct reports (sworn and civilian) and 87 employees.

*Captain, Operations Bureau, Patrol Division, 1989 – 1992*
Commanded all uniformed patrol services to the central beach community as well as the southeast and southwest communities during the evening shift. Staff included 37 employees.

*Sergeant, Operations Bureau, Patrol Division, 1984 – 1989*
Supervised police officers performing uniformed patrol operations and was assigned at various times to all three patrol districts of the City of Fort Lauderdale.

*Detective, Investigative Bureau, Criminal Investigations Division, 1977 – 1984*
Investigated felony crimes with a concentration on major violent crimes including two years of service in the Homicide Unit.

*Police Officer, Operations Bureau, Patrol Division, 1974 – 1977*
Uniform patrol service and experience including the investigation of crimes, traffic enforcement and crash investigation in all three police districts of the City of Fort Lauderdale and served as a Field Training Officer.

## EDUCATION

FBI – National Academy (191st Session)

Southern Police Institute, University of Louisville, Command Officers Development Course (4th Session)

Broward County Police Academy (46th Session)

University of South Florida, Bachelor of Arts, Sociology

Over 4,800 hours of Advanced, Specialized and Management Training in Law Enforcement (1974-2020)

## TRAINING (SELECTED)

Force Science Institute, University of Minnesota – Certified Force Science Analyst (2015)

TASER Conducted Electrical Weapon (CEW) (2015)

IACP – Use of Force Investigation (2015)

IACP – A Critical Analysis of Police Use of Force (2015)

IACP – De-Escalation (2015)

IACP – Use of Force: Are You Prepared (2015)

Florida Sheriff's Risk Management – Use of Force (2015)

Lockup - Police Training Systems -  Use of Force for Executives, Command, Supervisors & Trainers (2015)

AELE – Management, Oversight and Monitoring Use of Force (2014)

## NOTED PROFESSIONAL ACTIVITIES

### Broward County E-911 Consolidated Regional Communications System

Directed and monitored the operation and the consolidation of the Broward County Regional Communications System that provides E-911 and law enforcement and fire rescue dispatch services for 29 municipalities and the special patrol areas of the Fort Lauderdale Hollywood International Airport, Port Everglades and the Department of Detention through call taking, dispatch, teletype, supervision, quality assurance, audio evidence and training services.

### Crisis Intervention Team (CIT) Training

Implemented the "Memphis Model" CIT Program in Broward County resulting in over 2,500 local and county law enforcement officers achieving CIT certification to sustain the CIT mission for more effective interactions among law enforcement, mental health care providers, individuals with mental illness, their families and communities and to reduce the stigma of mental illness. (2000 – 2018)

### Policy Review and Development

Over 20 years of experience in the executive level review, development and revision of agency policies to maintain and reflect current police practices, with a focus in the high liability areas of use of force, pursuits and arrests.

### Homeless Initiatives

Spearheaded the development and implementation of the police department's efforts to meet the expectations and often conflicting demands of the city commission, the business and community leaders, advocates for the homeless, social service providers and the homeless population. Developed a law enforcement protocol regarding police-homeless contacts, implemented Homelessness 101 training program for police officers and initiated a nationally acclaimed Police Homeless Outreach Team program that was featured in The Journal: The Voice of Law Enforcement, (May 2000). Worked in a collaborative approach with city staff, Broward County, Broward Partnership for the Homeless, Inc., Broward Coalition for the Homeless, Inc., and Legal Aid regarding the issue of homelessness.

Replicated these efforts with the Broward Sheriff's Office (BSO) and developed the BSO Homeless Outreach Team (awarded the International Association of Chiefs of Police 2014 Civil Rights Award), and the resulting Broward County Multi-Agency Homeless Outreach Task Force. (2013 – 2018)

### Civil Citation Program

Led the full implementation of the Civil Citation Program at the Broward Sheriff's Office to allow youth who have committed a minor first-time, second and third-time misdemeanor offense the opportunity to participate in a pre-arrest civil citation program without the stigma of an arrest record. (2013 – 2018)

### Accreditation

Initiated the successful process for the Fort Lauderdale Police Department to attain accreditation recognition from the Commission for Florida Law Enforcement Accreditation and served as an assessor for the Commission on Accreditation for Law Enforcement Agencies (CALEA).

**Management Assessor**
A visiting management assessor for numerous municipal and county governments including Birmingham (AL), Jacksonville (FL), Little Rock (AR), Margate (FL), Miami (FL), Miami-Dade County (FL), Orlando (FL), Pompano Beach (FL) and Troy (OH).

**Instructor – Facilitator**
Developed and presented workshops regarding the police response to homelessness at the following:

IACP International Conference, Chicago, IL (2015)

Broward County Neighborhood Conference, Hollywood, FL (2001)

Florida Neighborhood Conference, Fort Lauderdale, FL (2000)

Florida Coalition for the Homeless State Conference, Orlando, FL (2000)

Florida Department of Law Enforcement, Best Practices Conference, Tallahassee, FL (2000)

National Alliance to End Homelessness Annual Conference, Washington, DC (1999)

**Commendation and Awards**
Recipient of over 100 letters of commendation and appreciation

CIT International "Pioneer Award" (2017)

International Association of Chiefs of Police - Agency Civil Rights Award - BSO Homeless Outreach Team (2014)

Police Officer of the Month (1986)

**Publications**
"Recapturing Lives: Homeless Outreach in Broward County, Florida," *The Police Chief*, (Nov 2014)

"Police Response to Homelessness," *The Journal: The Voice of Law Enforcement*, (Fall 2000)

## ACTIVE MEMBERSHIPS

FBI National Academy Associates (FBI NA)

International Association of Chiefs of Police (IACP) (Life Member)

National Tactical Officers Association (NTOA)

Police Executive Research Forum (PERF)

National Emergency Number Association (NENA)

Association of Public-Safety Communications Officials-International (APCO)